# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OKLAHOMA

KATHLEEN J. CRABTREE, )
)
      **Plaintiff,** )
)
vs. ) Case No. 14-cv-12-TLW
)
CAROLYN W. COLVIN, )
Acting Commissioner of Social Security, )
)
      **Defendant.** )

## OPINION AND ORDER

Plaintiff Kathleen J. Crabtree seeks judicial review of the decision of the Commissioner of the Social Security Administration denying her claim for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act ("SSA"), 42 U.S.C. §§ 416(i), 423, and 1382c(a)(3). In accordance with 28 U.S.C. § 636(c)(1) & (3), the parties have consented to proceed before a United States Magistrate Judge. (Dkt. 6). Any appeal of this decision will be directly to the Tenth Circuit Court of Appeals.

## INTRODUCTION

In reviewing a decision of the Commissioner, the Court is limited to determining whether the Commissioner has applied the correct legal standards and whether the decision is supported by substantial evidence. See Grogan v. Barnhart, 399 F.3d 1257, 1261 (10th Cir. 2005). Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. See id. The Court's review is based on the record, and the Court will "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." Id. The Court may neither re-weigh the

evidence nor substitute its judgment for that of the Commissioner. See Hackett v. Barnhart, 395 F.3d 1168, 1172 (10th Cir. 2005). Even if the Court might have reached a different conclusion, if supported by substantial evidence, the Commissioner's decision stands. See White v. Barnhart, 287 F.3d 903, 908 (10th Cir. 2002).

## BACKGROUND

Plaintiff, then a 35-year old female, filed for benefits under Title II on December 14, 2010. (R. 268-69). Plaintiff alleged a disability onset date of December 16, 2002. (R. 268). Plaintiff claimed that she was unable to work due to "knees, back, arthritis, bursitis, OCD, ADHD, anxiety, depression, diabetes, neuropathy." (R. 310). Plaintiff's claims for benefits were denied initially on May 4, 2011, and on reconsideration on June 24, 2011. (R. 166-69, 152-75, 178-80). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (R. 181). While the request for an ALJ hearing was pending, plaintiff filed an application for Title XVI benefits on April 25, 2012.[1] (R. 12). The Social Security Administration "escalated" plaintiff's Title XVI application to the hearing level so that it could be heard in conjunction with the Title II application. Id. The ALJ held a hearing on April 9, 2012, but decided to postpone the hearing to obtain expert testimony that would assist the ALJ in assessing plaintiff's condition at the time of her remote onset date. (R. 157-65). The ALJ reconvened the hearing on July 10, 2012, and heard testimony from plaintiff, two medical experts, and a vocational expert. (R. 48-156). The ALJ issued a decision on August 30, 2012, denying benefits. (R. 9-47). The Appeals Council denied review, and plaintiff appealed. (R. 1-7; dkt. 2).

---

[1] Plaintiff's application for Title XVI benefits is not included in the administrative record, but the ALJ notes it in his decision. (R. 12).

2

**The ALJ's Decision**

The ALJ found that plaintiff was insured under Title II through June 30, 2005. (R. 14). Plaintiff had not performed any substantial gainful activity since December 16, 2002, her alleged disability onset date. Id. The ALJ found that plaintiff had severe impairments of "degenerative joint disease of the lumbar spine, obesity, hypertension, diabetes mellitus, asthma and affective mood disorder and generalized anxiety disorder." (R. 15).

Plaintiff's impairments did not meet or medically equal a listing. Id. The ALJ evaluated the severity of plaintiff's mental impairments using the "paragraph B" criteria and determined that plaintiff had moderate limitations in activities of daily living; social functioning; and concentration, persistence, or pace. Id. Plaintiff had not experienced any episodes of decompensation. Id.

The ALJ then reviewed plaintiff's testimony, the testimony of the two medical experts, and plaintiff's medical records.

Plaintiff testified that she was injured while at work as a certified nurse's aide in December 2002 when she tried to move a patient by herself. (R. 17). Plaintiff initially "felt a pop in her back" and later experienced the sensation that "her feet were 'on fire.'" Id. She completed her shift but advised the hospital that she was unable to go to work the next day. Id. Instead, plaintiff attended her daughter's church program and then sought treatment at the emergency room. Id. The emergency room physician gave plaintiff pain medication and advised her to contact her employer. Id. Plaintiff testified that she reported the injury the next day, but her employer did not take her injury seriously. Id. Three weeks later, the employer ordered an MRI that revealed a herniated disc. Id.

3

Plaintiff had surgery in February 2003. Id. She testified that the surgery "helped 'at first.'" Id. Afterwards, the pain was confined to her lower back. Id. She underwent a second MRI. (R. 17-18). She received treatment from her surgeon, Dr. Benjamin Benner, "until he 'couldn't do anything else.'" (R. 18). Plaintiff testified that her surgeon "believed she was trying to get income from worker's compensation, but she stated that was not true." Id. The surgeon released plaintiff to light duty work and recommended physical therapy. Id.

Plaintiff testified that she then saw a second doctor, Dr. James Rodgers, in June and July 2003, who initially told her that her surgeon had performed the wrong surgery and ordered additional tests. Id. Plaintiff testified that he "retracted his report" after the worker's compensation insurance company videotaped plaintiff eating lunch in a restaurant and taking her daughter to a movie at a time when plaintiff was supposed to be in physical therapy. Id. Plaintiff testified that her employer threatened Dr. Rodgers in order to have him retract the report. Id.

Plaintiff's treatment was delayed after she became pregnant because the third physician, Dr. Hisey, would not treat her while she was pregnant. Id. Plaintiff gave birth in June 2004, but did not return to Dr. Hisey for treatment. Id. Instead, plaintiff went back to see Dr. Rodgers. Id.

Plaintiff last saw Dr. Rodgers at the time of the functional capacity evaluation. Id. Plaintiff disagreed with the evaluation because she took pain medication in order to complete the assessment and "was down for a week" due to pain caused by the effort she put into the evaluation. Id.

Plaintiff testified that she has ongoing medication side effects of "short-term memory loss, drowsiness, and difficulty concentrating." Id. Plaintiff has taken her medication, Neurontin and Percocet, since 2003. Id. She must take Neurontin four times daily, and it "puts her out." Id. Although it helps with sciatic nerve pain, plaintiff testified that she has never been pain free. Id.

4

Since her date last insured, plaintiff has developed arthritis in her knees, which affects her gait. Id. Plaintiff has gained 150 pounds since her initial injury and identifies her obesity as "an issue." Id. Plaintiff also has plantar fasciitis and has suffered from irritable bowel syndrome. (R. 19).

Plaintiff testified that she has suffered from ADHD since she was a child. Id. Plaintiff also reported that she has experienced OCD, depression, anxiety, and difficulty in crowds since 1999. Id. Plaintiff was taking prescription medication for depression and anxiety as early as 1999-2000. Id. Plaintiff admitted, however, that these issues did not prevent her from working and that she loved her job and was looking forward to attending nursing school. Id.

Plaintiff testified, however, that her injury increased her depression. Id. Plaintiff stated that her depression now "stems from her inability to 'do things.'" Id. Since her 2002 injury, plaintiff stated that "she has experienced 'rapid heartbeat'" and "believes she is 'going to die.'" Id. She testified to mood swings, but she stated that her doctor has ruled out bipolar disorder. Id. Plaintiff is currently taking medication, and her newest prescription is "actually 'working well.'" Id.

She also stated that she has difficulty with impulse control, which manifests as irresponsible spending habits, but she is no longer taking the medication that treated those symptoms. Id. Plaintiff complained that she has difficulty concentrating and making decisions. Id.

Plaintiff testified that she spends most of her time "in the recliner or 'lying on the couch' (with pillows) to relieve back pressure." (R. 20). She can sit for twenty minutes. Id. She can stand in line for ten minutes, but she has to shift positions. Id. She often falls asleep. Id. She testified that "she might be able to 'work a little bit,'" but she could not keep a job based on her

5

need to lie down frequently. Id. She also testified that her pain prevented her from bending to shower properly. Id.

In 2004 and 2005, plaintiff's back and right leg kept her from working. Id. At that time, she could only stand ten to twenty minutes. Id. She could also lift her baby at that time, but she could not do it without pain once he weighed twenty-five pounds. Id.

The ALJ then took testimony from Dr. Subramanian Krishnamurthi, a medical expert. Id. Dr. Krishnamurthi had reviewed plaintiff's medical records and heard her testimony at the hearing. Id. He opined that plaintiff has severe impairments of degenerative joint disease of the lumbosacral spine, a history of back surgery, and depression. Id. He opined that plaintiff's diabetes mellitus and asthma presented after her date last insured. Id. Dr. Krishnamurthi noted that plaintiff's EMG test was "normal." Id.

With respect to plaintiff's functional capacity, Dr. Krishnamurthi relied on several medical records that indicated plaintiff could perform light work. Id. Specifically, Dr. Krishnamurthi cited to the September 2004 opinion from treating physician, Dr. Rodgers, that plaintiff "could return to a light duty position." Id. He also relied on the Functional Capacity Evaluation, which indicated that plaintiff was able to complete the treadmill test. (R. 20-21). Dr. Krishnamurthi stated that plaintiff's ability to complete the test was consistent with the ability to perform light work. (R. 21). He opined that plaintiff could perform light work with an additional limitation to occasional bending, stooping, crouching, and crawling. (R. 20).

The ALJ also took testimony from Dr. John Hickman, a second medical expert, who addressed plaintiff's mental limitations. (R. 21). The ALJ stated that "Dr. Hickman undertook what could only be described as a clinical interview." Id. The ALJ recounted most of the interview in the decision in order to demonstrate that Dr. Hickman's conclusions were based, not

on the record, but on plaintiff's subjective testimony, which the ALJ labeled an "unfortunate and extensive clinical interview." Id.

Dr. Hickman asked plaintiff about sleep apnea, which plaintiff stated was diagnosed in 1999-2000. Id. Plaintiff testified that she slept poorly at night but then stated that "in the past year, she has done nothing but sleep." Id. Dr. Hickman also asked plaintiff about her issues with concentration. Id. Plaintiff stated that she has difficulty with memory and concentration, based on an ADHD diagnosis from childhood and her current sleep disruptions. Id. Plaintiff also discussed her diagnosis of restless leg syndrome, stating that she has had it "her entire life" but that "it is now worse during the day." Id. Plaintiff then stated that Neurontin controlled the symptoms. Id.

When the ALJ asked Dr. Hickman for his opinion of plaintiff's mental limitations, Dr. Hickman stated that "it is very hard to know how disruptive it is, because her psychological records are minimal and very inconsistent." (R. 21-22). Dr. Hickman "admitted that he 'does not understand the diagnoses/medications prescribed'" and found that plaintiff's psychiatrist's GAF scores "are quite mild" in comparison to plaintiff's subjective allegations. (R. 22).

He then opined that plaintiff's physical impairments "all have a psychological impact on the brain in various ways" and that her "impairments equal the criteria of listings 12.04 and 12.06." Id. Dr. Hickman cited plaintiff's symptoms of depression and "manic-like states, such as being distracted, lack of concentration and difficulty controlling her impulses." Id. He also opined that plaintiff's limitations in the "paragraph B" criteria would vary based on her pain levels, sleep patterns, and use of medication and "would range from moderate to marked." Id. With respect to the "paragraph C" criteria, Dr. Hickman opined that the medical records demonstrated a two-year history of chronic affective disorder with "marginal adjustment" to

7

limitations. Id. Therefore, "even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate." Id.

After reviewing Dr. Hickman's opinion, the ALJ concluded that Dr. Hickman's opinion was not corroborated by the medical evidence. Id. The ALJ found that Dr. Hickman relied entirely on plaintiff's statements at the hearing rather than the objective medical evidence and rejected his opinion. (R. 22, 38-39).

The ALJ then addressed the objective medical evidence for both plaintiff's Title II application and her Title XVI application. In February 2002, plaintiff reported that she was improving with use of a C-PAP machine. (R. 23). In June 2002, plaintiff complained of a poison ivy rash that she contracted while "three-wheeling." Id. The ALJ noted that the ability to participate in such an activity was inconsistent with plaintiff's claims of disabling pain. Id. Plaintiff had tests run in late 2002 for abdominal pain, but all test results were normal. Id. In November 2002, plaintiff reported that Ativan decreased her anxiety and depression. Id.

With respect to her back injury, x-rays in December 2002 were normal "except for an apex left curvature." Id. However, an MRI taken two weeks later "revealed right paramedian L4-L5 disc protrusion and left paramedian L5-S1 focal disc protrusion." Id. Plaintiff sought treatment from Dr. Benner, who opined that plaintiff was unable to work at the time. Id. Dr. Benner recommended surgery, which was performed in February 2003. Id.

Plaintiff was in the hospital a few days longer than anticipated due to continued "local back complaints" and slow ambulation. Id. Plaintiff was discharged with order to continue outpatient physical therapy, but she was re-admitted to the hospital a week later with complaints of "postoperative back pain." Id. Dr. Benner recommended admission due to concerns about "the possibility of a deep wound infection," but tests ruled out that possibility. (R. 24). After an MRI

8

revealed no new issues, Dr. Benner diagnosed plaintiff with "rebound back pain." Id. Dr. Benner arranged physical therapy, discussed changes to plaintiff's psychotropic medication with plaintiff's family physician, and obtained a hospital bed for plaintiff to use at home. Id.

Plaintiff reported "better control" of her anxiety and depression after her release from the hospital. Id. Plaintiff also made "marvelous progress" with physical therapy. Id. By the end of April 2003, plaintiff's pain medications were reduced, and she was released to perform "light-duty work (20 pounds lifting, with no prolonged sitting, standing, bending, or twisting)." Id. Dr. Benner anticipated reducing plaintiff's limitations "significantly" within one month. Id.

In July 2003, Dr. Rodgers advised plaintiff to return to work. Id. An EMG study conducted in October 2004 showed "low amplitude (chronic) denervation potentials with needle EMG of the bilateral lower lumbar paraspinal muscles," a condition consistent with "focal denervation status post surgical intervention" rather than radiculopathy. (R. 24-25). All other results were normal. (R. 25). Later that month, Dr. Rodgers ordered a Functional Capacity Evaluation because plaintiff had reached maximum medical improvement and was in a "stable and stationary" condition. Id. The evaluation would allow plaintiff to be "rated and released." Id. Dr. Rodgers opined that plaintiff was not a candidate for surgery at the time and that she "should focus on weight loss, reconditioning her abdominal and lumbar muscles and 'moving on with her life.'" Id.

In November 2004, Dr. Rodgers found no "significant neurological deficit." Id. He again recommended weight loss and strengthening exercises. Id. At that appointment, Dr. Rodgers noted that plaintiff took "Percocet at bedtime and only occasionally during the day" and opined that she should be able to continue taking narcotics and still remain functional. Id.

Plaintiff underwent the Functional Capacity Evaluation in November 2004. Id. The ALJ noted that, based on the results of that evaluation, plaintiff was able to perform light work. Id. When plaintiff saw Dr. Rodgers again in December 2004, he agreed that plaintiff could perform light work. Id. Dr. Rodgers imposed the following restrictions: (1) plaintiff could lift no more than twenty pounds repeatedly; (2) plaintiff would need to change position from sitting to standing as necessary every thirty to forty minutes, standing for no more than thirty minutes at a time; (3) plaintiff could push no more than twenty-five to thirty pounds; (4) plaintiff could not perform overhead work; and (5) plaintiff could not climb ladders or operate heavy equipment. Id.

Plaintiff saw Dr. Richard Hastings in May 2005. Id. He recommended that plaintiff continue her prescription medications as needed with appropriate monitoring. Id. He also recommended that plaintiff receive "vocational rehabilitation in conjunction with a full functional capacity evaluation." (R. 26). In October 2006, plaintiff again recommended that plaintiff continue her medications. Id. He suggested the use of a muscle relaxant once plaintiff stopped nursing her child. Id.

In late 2006, plaintiff saw two doctors for a possible stress fracture. Id. Plaintiff refused to submit to imaging tests and was given a walker. Id. Approximately six weeks later, plaintiff sought treatment from a second doctor. Id. At that point, she consented to x-rays. Id. The results were normal, although there was a small line across the tibia "consistent with an old, healed stress fracture." Id. The doctor recommended an MRI, which showed no abnormalities. Id. The doctor recommended rehabilitative exercises and a low impact exercise program that would address weight loss. Id.

Plaintiff saw Dr. Sudip Tripathy in 2007. Id. In January 2007, "he stressed the importance of diet and exercise." Id. Plaintiff reported that she was "sleeping better." Id. In September 2007,

10

plaintiff had lost five pounds. Id. Dr. Tripathy noted that the worker's compensation agency had determined that plaintiff should see a pain specialist. Id. Plaintiff later underwent a sleep study, and in October 2007, Dr. Tripathy diagnosed plaintiff with sleep apnea. Id. He also suggested that she consider gastric bypass or banding surgery. Id.

Also in October 2007, plaintiff reported that Xanax was working well at controlling her anxiety. Id.

Plaintiff had another MRI in March 2008. (R. 27). Dr. Randall Hendricks opined that plaintiff did not need additional medical treatment but did need to lose weight and strengthen her core. Id. A second doctor made the same recommendations in April 2008 after plaintiff "admitted she had not been to physical therapy in 'quite some time.'" Id.

Plaintiff underwent an MRI of her cervical spine and EMG of both arms in March 2008. Id. Both tests were within normal limits. Id.

In June 2008, plaintiff reported that "her irritability is 'better' and she 'feels better overall.'" Id. The following month, Dr. Tripathy noted that plaintiff had lost twenty pounds and was controlling her blood sugar without medication. Id. Plaintiff was using medication for asthma but was still wheezing "some." Id. Her pain was controlled with a patch. Id. Plaintiff reported additional weight loss in April 2009. Id.

In September 2009, plaintiff reported that walking regularly had improved her back and her mood. Id. Plaintiff also reported increased focus and no mood swings with the use of Strattera. Id. The following month, she stated that her husband's behavior impacted her mood, but plaintiff's doctor found that she was "not fundamentally depressed underneath it all." Id. In December 2009, plaintiff reported that she was "doing well," but she complained of some continuing problems with concentration and memory, headaches from the use of Strattera, and

mood changes if she missed a dose of Trazodone. (R. 28). Her physician adjusted her medications. Id.

Plaintiff underwent an MRI of the thoracic spine, cervical spine, and brain in December 2009, all of which were normal. Id. An MRI of her lumbar spine "revealed posterolateral disc protrusions with associated annulus fibrosis tears at L3-L4 and L4-L5." Id. The doctor who reviewed the MRI results, also found evidence of radiculopathy. Id.

In January 2010, plaintiff reported trouble with focus and control, but her irritability was "not outside of normal range," despite trouble relating to her young son. (R. 29). Plaintiff's Zoloft and Focalin dosages were increased. (R. 28). The following month, plaintiff reported that the medication adjustments were helpful. Id. Although her mood was improved, plaintiff reported that she had some issues with impulsive spending. Id. To address the issue, plaintiff's husband was dealing with the family finances. Id. Plaintiff reported doing well on her medication in July 2010, but "she stated that her moods are contingent on 'how her spouse is doing.'" Id. She believed that she would still have depression, but she could not separate the two issues. Id. Dr. Bradley McClure found plaintiff to have a "bright" affect, and he believed that treatment was not a viable option because "much of her symptomatology is reactive to environmental stress." (R. 29). In September 2010, she reported that she was "doing well" because her husband was getting treatment and experiencing less stress. Id. Plaintiff did complain that she was restless and bored being a housewife. Id.

Plaintiff complained of knee pain in September 2010. Id. Her physician noted that plaintiff had complained of knee pain in the past, but he had not found treatment necessary. Id. At this point, however, he recommended a corticosteroid injection, but he could not administer the shot without authorization. Id.

In March 2011, plaintiff complained of low back pain and radiculopathy in the legs. Id. Examination revealed "paraspinous spasm of the lumbar region with tender intervertebral space at L3-L4, L4-L5 and L5-S1." Id. Plaintiff also had "mild tenderness of sacroiliac joints" and some swelling in the right knee. Id. Plaintiff had good reflexes and strength. Id. Her physician opined that plaintiff had "lumbar postlaminectomy syndrome" and nonoperable "positive discogram at L3-L4, L4-L5 and L5-S1." Id. He also noted radiculopathy and "right knee arthritis and bursitis associated with gait abnormality from her previous back surgery." Id. The physician refilled plaintiff's medications but did not adjust the dosages. Id.

Plaintiff sought treatment for knee pain with a new doctor one week later. Id. X-rays were normal "with slight patellar lift." Id. The doctor recommended exercise and weight loss. Id. The doctor specifically noted that plaintiff's knee pain was not associated with her previous surgery or her gait. (R. 29-30). In fact, plaintiff's gait was normal. (R. 30).

Plaintiff reported increased anxiety in May 2011, based on "'angry episodes' related to her spouse." Id. She reported panic attacks in July 2011, which she felt resulted from stress due to "her home being in foreclosure and 'issues with teenagers.'" Id. Plaintiff denied depression in September 2011, but she reported that she was isolating herself and not leaving the house. Id.

During an examination in December 2011, plaintiff's physician, Dr. Gerald Hale noted that she was ambulating slowly but without difficulty. Id. He recommended continuing her medications as prescribed, walking for exercise, and losing weight through healthy eating. Id. In March 2012, however, Dr. Hale noted that plaintiff had gained fifty-eight pounds in two-and-a-half years and was at her highest weight. Id. The weight gain had impacted her diabetes and caused swelling in her legs. (R. 31). However, plaintiff was able to stand from a seated position

without difficulty. Id. Dr. Hale prescribed Oxycodone on a temporary basis but set a weight loss goal for plaintiff. Id.

Plaintiff's blood pressure was not controlled in May 2012, but plaintiff admitted that she was not taking her medication. Id.

Dr. McClure noted that plaintiff's mood was "bright" in May 2012, but plaintiff reported that she had been in a deep depression. Id. Plaintiff had discontinued the use of some medications, so Dr. McClure made some adjustments to her medications. Id.

Based on the thorough review of the medical records, the ALJ found that plaintiff was not entirely credible and was exaggerating her complaints of pain. Id. The ALJ noted that plaintiff's testimony regarding her inability to sit, stand, and stay awake was inconsistent with the medical evidence and with some of her own testimony. (R. 32). The ALJ relied on the testimony of Dr. Krishnamurthi, who relied on plaintiff's medical records opining that plaintiff could perform light work. Id. The ALJ also cited plaintiff's failure to follow through with recommended treatment, particularly physical therapy and diet/exercise. Id. The ALJ cited numerous instances in the record in which plaintiff's physicians cited exercise as the best treatment plan. (R. 32-33). Although plaintiff's back surgery would normally weigh in favor of plaintiff's credibility, the ALJ found "that the surgery was generally successful." (R. 33). The ALJ cited numerous medical records that demonstrated plaintiff reached maximum medical improvement following the surgery and was able to perform light work once she recovered. (R. 34). With respect to plaintiff's mental impairments, the ALJ found that plaintiff's symptoms were well-controlled with medication and that plaintiff's medication regimen was fairly stable, with only periodic modifications. (R. 35). The ALJ also noted instances, both with respect to plaintiff's physical and mental impairments, in which plaintiff would discontinue medication on her own. (R. 37).

The ALJ concluded that plaintiff retained the residual functional capacity to perform light work with a limitation to occasional bending, stooping, crouching, and crawling. (R. 16). Plaintiff also had moderate limitations "in her ability to understand, remember and carry out detailed instructions, maintain attention and concentration for extended periods, and interact appropriately with the general public, co-workers and supervisors." Id. Plaintiff could not perform her past relevant work as a nurse's aide, collection clerk, or medical transcriptionist, but she could perform other work. (R. 39). The ALJ determined that plaintiff could perform sedentary jobs, such as a "hand suture winder," "touch-up screener," and "table worker/deburrer." (R. 40). Accordingly, the ALJ found plaintiff not disabled. (R. 40-41).

## ANALYSIS

On appeal, plaintiff raises five points of error: (1) that the ALJ improperly evaluated plaintiff's asthma; (2) that the ALJ improperly rejected the opinion of medical expert, Dr. Hickman; (3) that the ALJ should have ordered a consultative examination to fully develop the record; (4) that the residual functional capacity finding does not contain all of the limitations in the medical record and that the ALJ failed to properly weigh all of the medical opinion evidence; and (5) that the ALJ failed to perform a proper credibility analysis.

For the reasons that follow, the Court finds that the ALJ erred only in his failure to weigh the medical source opinions, particularly the opinion of treating physician, Dr. Rodgers.

**Medical Source Opinions**

Plaintiff argues that the ALJ failed to weigh the medical opinion evidence and, as a result, failed to include some of the limitations in those opinions in the residual functional capacity findings. (Dkt. 13). Plaintiff specifically cites to the opinion of treating physician, Dr. Rodgers; medical expert, Dr. Krishnamurthi; and the functional capacity analysis. Id. Plaintiff

contends that the ALJ's residual functional capacity findings should have included additional limitations for a sit/stand option, occasional reaching, no overhead work, no operation of heavy machinery, and no ladder climbing. Id.

The Commissioner argues that plaintiff has selected "various isolated restrictions she hand-picks from the record" to argue that the ALJ did not include all of the limitations borne out by the record into the residual functional capacity findings. (Dkt. 16). The Commissioner argues that these limitations are not established by the evidence but are "passing" references in the record. Id. The Commissioner also argues that even if the ALJ should have included these additional restrictions, plaintiff cannot show harm resulting from that failure because the ALJ's findings at step five do not involve the limitations plaintiff argues should have been included. Id. The Commissioner does not specifically address plaintiff's argument that the ALJ failed to weigh the medical opinion evidence. Instead, the Commissioner argues, in addressing the credibility issue, that the ALJ relied on "explicit findings by two treating physicians, a medical expert, and the individual conducting her [functional capacity evaluation] that Plaintiff was capable of light-duty work." Id.

Dr. Rodgers treated plaintiff's back pain after her surgery as part of her workers' compensation claim. (R. 735-50). After treating plaintiff for just over a year, Dr. Rodgers believed that plaintiff had reached maximum medical improvement. (R. 739-40). Dr. Rodgers recommended that plaintiff undergo a functional capacity evaluation so that she could be "rated and released" from treatment. (R. 740).

After reviewing the functional capacity assessment, Dr. Rodgers opined that plaintiff could "resume work activities in a 'light work category', according to the US Department of Labor, Dictionary of Occupational Titles." (R. 735). Dr. Rodgers relied on plaintiff's ability to

lift to support his conclusion. Id. Dr. Rodgers also would impose "permanent restrictions" of a sit/stand option "as necessary every 30 to 40 minutes" with a limitation to no more than thirty minutes of standing at one time. Id. He also opined that plaintiff should not "lift repeatedly more than 20 to 25 pounds or push more than 25 to 30 pounds" and should not "do overhead work, climb ladders or operate heavy equipment." Id. The ALJ discussed this opinion generally but did not weigh it. (R. 25).

Ordinarily, a treating physician's opinion is entitled to controlling weight when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); see also Hackett v. Barnhart, 395 F.3d at 1173-74 (citing Watkins v. Barnhart, 350 F.3d 1297, 1300-01 (10th Cir. 2003)). If the ALJ discounts or rejects a treating physician opinion, he is required to explain his reasoning for so doing. See Frey v. Bowen, 816 F.2d 508, 513 (10th Cir. 1987) (stating that an ALJ must give specific, legitimate reasons for disregarding a treating physician's opinion); Thomas v. Barnhart, 147 Fed.Appx 755, 760 (10th Cir. 2005) (holding that an ALJ must give "adequate reasons" for rejecting an examining physician's opinion and adopting a non-examining physician's opinion).

The analysis of a treating physician's opinion is sequential. First, the ALJ must determine whether the opinion qualifies for "controlling weight," by determining whether it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and whether it is consistent with the other substantial evidence in the administrative record. Watkins, 350 F.3d at 1300. If the answer is "no" to the first part of the inquiry, then the analysis is complete. If the ALJ finds that the opinion is well-supported, he must then confirm that the opinion is consistent

17

with other substantial evidence in the record. Id. "[I]f the opinion is deficient in either of these respects, then it is not entitled to controlling weight." Id.

However, even if the ALJ finds the treating physician's opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the record, treating physician opinions are still entitled to deference and must be evaluated in reference to the factors enumerated in 20 C.F.R. §§ 404.1527 and 416.927. Those factors are as follows:

> (1) the length of the treating relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed, (3) the degree to which the physician's opinion is supported by relevant evidence, (4) consistency between the opinion and the record as a whole, (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

Watkins, 350 F.3d at 1301 (citing Drapeau v. Massanari, 255 F.3d 1211, 1213 (10th Cir. 2001)). The ALJ must give good reasons in his decision for the weight he ultimately assigns the opinion. Id. (citing 20 C.F.R. § 404.1527(d)(2)). The reasons must be of sufficient specificity to make clear to any subsequent reviewers the weight the adjudicator gave to the treating physician's opinion and the reasons for that weight. See Anderson v. Astrue, 319 Fed.Appx. 712, 717 (10th Cir. 2009) (unpublished)[2].

In this case, however, the ALJ appears to have accepted Dr. Rodgers' opinion that plaintiff can perform light work but did not adopt all of the restrictions that Dr. Rodgers imposed. Accordingly, the Court can determine that the ALJ did not give controlling weight to

---

[2] 10th Cir. R. 32.1 provides that "[u]npublished opinions are not precedential, but may be cited for their persuasive value."

Dr. Rodgers' opinion but cannot determine what specific, legitimate reasons the ALJ had for not adopting all of the restrictions.

The Commissioner argues that the harmless error analysis should apply because the limitations plaintiff argues should have been included are not at issue based on the ALJ's step five findings.

The failure to assign a weight to a treating physician's opinion does not always constitute reversible error. See Kruse v. Astrue, 436 Fed.Appx. 879, 882-83 (10th Cir. 2011) (unpublished) (holding that the ALJ did not commit reversible error in failing to "state a specific weight" attached to a treating physician's opinion where the ALJ's explanation made it clear that the ALJ attached little weight to the opinion). However, the circumstances in which the failure to weigh a treating physician's opinion qualifies as harmless error are extremely limited. See Howard v. Barnhart, 379 F.3d 945, 947 (10th Cir. 2004) (holding that "[w]hen the ALJ does not need to reject or weigh evidence unfavorably in order to determine a claimant's RFC, the need for express analysis is weakened."); Keyes-Zachary v. Astrue, 695 F.3d 1156, 1161-62 (10th Cir. 2012) (permitting application of the harmless error analysis "absent inconsistencies between or among the medical opinions and the ALJ's RFC determination.").

Based on the clear discrepancies between the limitations imposed in Dr. Rodgers' opinion and the ALJ's ultimate residual functional capacity determination, the Court finds that it cannot apply the harmless error analysis in this case. Accordingly, the Court must remand the case in order for the ALJ to conduct a proper treating physician's analysis and, if necessary, weigh all of the medical opinions in the record.[3] See 20 C.F.R. §§ 404.1527(e)(2)(ii);

---

[3] The ALJ only assigned weight to the opinions of the two medical experts who testified at the hearing.

416.927(e)(2)(ii). See also Keyes-Zachary v. Astrue, 695 F.3d 1156, 1161 (10th Cir. 2012) (holding that when an ALJ does not give controlling weight to the treating physician's opinion, he must weigh all of the medical opinions).

## CONCLUSION

For these reasons, the ALJ's decision finding plaintiff not disabled is **REVERSED AND REMANDED**. On remand, the ALJ should discuss the weight given to Dr. Rodgers' opinion and, if he gives less than controlling weight to any portion of that opinion, give specific, legitimate reasons for doing so. Additionally, if the ALJ does not give controlling weight to the treating physician's opinion, he should weigh all of the medical source opinions in the record. The ALJ's decision is affirmed in all other respects.

The Court also advises the ALJ to consider that, in this case, the applicable time periods for considering plaintiff's claims for disability under Title II and Title XVI do not overlap and, in fact, have an almost ten-year gap between the two periods of eligibility. The ALJ should clarify whether plaintiff's residual functional capacity applies to her Title II claim, her Title XVI claim, or both.

SO ORDERED this 30th day of March, 2015.

_____
T. Lane Wilson
United States Magistrate Judge